## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| GEORGE MILLION, | ) | |
| | ) | Case No. 3:22-cv-453 |
| *Plaintiff,* | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Jill E. McCook |
| DAVID B. RAUSCH, Director of the | ) | |
| Tennessee Bureau of Investigation, in his | ) | |
| official capacity, | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION

Before the Court is Plaintiff George Million's motion for preliminary injunction (Doc. 8) against Defendant David B. Rausch, in his official capacity as Director of the Tennessee Bureau of Investigation ("TBI"), requesting that TBI be enjoined from enforcing the Tennessee Sexual Offender and Violent Sexual Offender Registration and Tracking Act of 2004 ("SORVTA" or "the Act"), Tenn. Code Ann. § 40-39-201, *et seq.*, against him. For the reasons set forth below, Million's motion (Doc. 8) will be **GRANTED**.

## I. BACKGROUND

### A. SORVTA's Evolution

#### i. *Tennessee's Sexual Offender Registration and Monitoring Act of 1994 ("SORMA")*

In 1994, the Tennessee General Assembly enacted the Sexual Offender Registration and Monitoring Act ("SORMA"), which charged the Tennessee Bureau of Investigation ("TBI") with "establish[ing], maintain[ing], and update[ing] a centralized record system of sexual offender registration and verification information." 1994 Tenn. Pub. Acts ch. 976, § 7(a). SORMA

obligated qualifying "sexual offenders" to register within ten days of release without supervision from probation, parole, or incarceration. *Id.* § 4. From then on, registrants had ten days to complete and return registration and monitoring forms sent to them by TBI. *Id.* § 5. A change of residence, even if temporary, also triggered a ten-day deadline to complete a form. *Id.* § 4. The majority of this information was kept confidential. *Id.* §§ 4, 7(c). If a registrant was found to have violated SORMA, he could be charged with a misdemeanor. *Id.* § 9.

### ii. Tennessee's Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004 ("2004 SORVTA")

Following a series of amendments, SORMA was ultimately repealed and replaced with Tennessee's Sexual Offender and Violent Sexual Offender Registration, Verification, and Trafficking Act ("2004 SORVTA") in 2004. 2004 Tenn. Pub. Acts ch. 921, §§ 1–6.

2004 SORVTA required that all registrants make regular in-person reports to law-enforcement agencies, provide updates to certain living and working changes within forty-eight hours, and pay administrative fees. Tenn. Code Ann. §§ 40-39-203(a), 204(b), 204(c). 2004 SORVTA also codified a tiered classification system, distinguishing "violent sexual offenders"—a class of individuals convicted of an ever-expanding list of offenses—from "sexual offenders." 2004 Tenn. Pub. Acts ch. 921, § 1(24). With the label of "violent sexual offender" came heightened registration requirements; 2004 SORVTA mandated that this class of registrants verify their information even more frequently than other registrants and that they would remain on the registry for life. Tenn. Code Ann. §§ 40-39-204(c), 207(g)(2). Violations of 2004 SORVTA for all registrants were felony offenses. *Id.* § 208(b).

### iii. Subsequent Amendments

With each new amendment, the Tennessee General Assembly continued to tack on increasingly onerous restrictions, resulting in a current version of the statute that is far more

2

comprehensive than prior forms. In 2008, for instance, the statute was amended to restrict registrants' ability to live, work, and exist in proximity of schools, playgrounds, and other facilities. *See* 2008 Tenn. Pub. Acts, ch. 1164, § 11. Three years later, restrictions to entering libraries were appended. *See* 2011 Tenn. Pub. Acts, ch. 287. In 2014, the Tennessee General Assembly added a new rung on the sex-offender-registry hierarchy: "offenders against children." 2014 Tenn. Pub. Acts ch. 770, § 1, 2. Despite not necessarily falling into the "violent sexual offenders" category, this group of offenders also became subject to the lifetime registration requirements. *Id.* Additional limitations on movement were also incorporated; registrants were banned from living or working within 1,000 feet of schools, daycare centers, public parks, playgrounds, recreation centers, or public athletic fields. 2014 Tenn. Pub. Acts ch. 992, § 1. In 2015, the legislature added a prohibition on a registrant being alone with children other than his own in a "private area." *See* 2015 Tenn. Pub. Acts, ch. 516.

SORVTA in its current form hardly resembles the state's nascent sex-offender-registry system. All registrants included in the class of "violent sexual offenders," which now includes the categories of "sexual offenders who prey on children" and "repeat sexual offenders," must register for life. Tenn. Code Ann. §§ 40-39-201(b)(1), 40-39-202(20), (30)–(31), 40-39-207(g)(2). Members of the other group of registrants—"sexual offenders"—may petition to be removed from the registry after ten years, but removal hinges on an evaluation based on a variety of factors, including a registrant's track of compliance with SORVTA's requirements. *Id.* 40-39-207(i)(4)(A). Whichever label TBI has decided to assign a registrant is branded on his driver's license, which must be carried with him at all times. *Id.* §§ 55-50-353(a), 40-39-213(a).

The statute also requires registrants to submit personal information—including his home address, phone number, employer address, and photograph—that, as provided by the Act, "shall

3

be considered public information" available through a web page. *Id.* § 40-39-206(d). SORVTA also demands that changes in information, particularly that pertaining to a registrant's residence and employment, must be updated in person within forty-eight hours. *Id.* § 40-39-203(a)(1), (4), (6). Failure to do so constitutes a Class E felony. *Id.* § 40-39-208(b).[1]

Finally, SORVTA imposes a number of restrictions on a registrant's movement. For instance, registrants cannot knowingly:

(A) Be upon or remain on the premises of any building or grounds of any public school, private or parochial school, licensed day care center, other childcare facility, public park, playground, recreation center or public athletic field available for use by the general public in this state when the offender has reason to believe children under eighteen (18) years of age are present;

(B) Stand, sit idly, whether or not the offender is in a vehicle, or remain within one thousand feet (1,000′) of the property line of any building owned or operated by any public school, private or parochial school, licensed day care center, other child care facility, public park, playground, recreation center or public athletic field available for use by the general public in this state when children under eighteen (18) years of age are present, while not having a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there; or

(C) Be in any conveyance owned, leased or contracted by a school, licensed day care center, other childcare facility or recreation center to transport students to or from school, day care, childcare, or a recreation center or any related activity thereof when children under eighteen (18) years of age are present in the conveyance.

*Id.* § 40-39-211(d)(1). Violations are a Class E felony. *Id.* § 40-39-211(f).[2]

---

[1] A first offense is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-208(c). A second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." *Id.* § 40-39-208(d). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." *Id.* § 40-39-208(e).

[2] A first offense is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." *Id.* § 40-39-211(g)(2).

### B.     Plaintiff's Background

In 1993, before Tennessee's sex-offender registry was adopted, Plaintiff George Million was charged with committing a "lewd and lavacious act" in the presence of a minor in violation of Florida law.  (Doc. 9, at 2); *see* Fla. Stat. Ann. § 800.04.  Million was never convicted; instead, he entered into a plea agreement in which he agreed to a withheld adjudication— Florida's equivalent of a pretrial diversion.  (Doc. 9, at 3.)

After moving to Tennessee in 2006, Million represents he checked in with TBI about his registration requirements in the state.  (*Id.*)  According to Million, the former registry supervisor, Pam Beck, advised him that he did not need to register in Tennessee.  (*Id.*)  It was not until over fifteen years later, in January 2022, that Million was arrested for failing to comply with SORVTA.  (*Id.*)  TBI initially classified Million as a "violent sexual offender," despite his offense involving neither violence nor a child under age thirteen.  (Doc. 18-2, at 4–7.)  Within a month of Million filing a preliminary-injunction motion (Doc. 8), TBI mailed him a letter stating it was reclassifying him as a "sexual offender."  (Doc. 18-3, at 2.)

As a result of TBI's retroactive application of SORVTA, Million recounts the loss of his freedom, the waning of his personal relationships, and the financial toll on his business.  (Doc. 9, at 3–4.)  Because of the Act's restrictions on registrants' proximity to parks and ability to travel, Million states he can no longer support his fifteen-year-old daughter at her softball games.  (*Id.* at 3.)  Nor can he engage in a personal hobby—motorcycle racing.  (*Id.* at 4.)  Races often occur outside the state, and SORVTA significantly limits Million's movement.  (*Id.*)  Million also

---

Subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year."  *Id.* § 40-39-211(g)(3).  A violation that is "due solely to a lack of the written permission required" is punishable only by fine.  *Id.* § 40-39-211(g)(4).

describes the negative impact his compliance with SORVTA has had on his commercial roofing business—multiple companies that had contracted with Million stopped working with him following Million's compelled registration. (*Id.*)

On December 19, 2022, Million filed this action in this Court, naming David Rausch, the Director of TBI, as Defendant.[3] (Doc. 1.) On December 29, 2022, Million moved for a preliminary injunction against TBI, arguing its retroactive enforcement of SORVTA against him amounted to a violation of the Ex Post Facto Clause. (Doc. 8.) On February 7, 2023, the Court held a hearing on the motion, during which the parties defended their positions. (Doc. 20.) The motion is now ripe for the Court's review.

## II.    STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). In the Sixth Circuit, a district court is not required to hold an evidentiary hearing on a motion for preliminary injunction when the material facts are not in dispute. *Id.* at 553. However, a district court must hold an evidentiary hearing when facts related to the motion are in dispute. *Id.*

The Court considers the following factors when evaluating a motion for preliminary injunction:

(1) whether the movant has a strong likelihood of success on the merits;
(2) whether the movant would suffer irreparable injury without the injunction;
(3) whether issuance of the injunction would cause substantial harm to others; and
(4) whether the public interest would be served by the issuance of the injunction.

---

[3] As Rausch is sued in his official capacity, the Court will refer to the defendant in this case as "TBI."

*Id.* at 542 (citations omitted). The Court need not "make specific findings concerning each of the four factors . . . if fewer factors are dispositive of the issue." *Id.* (citations omitted). However, "it is generally useful for the district court to analyze all four of the preliminary injunction factors." *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)). "Rather than function as "rigid and unbending requirements[,]" the factors "simply guide the discretion of the court." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992).

While a party seeking a preliminary injunction need not "prove [its] case in full at a preliminary injunction hearing," *id.* (citations omitted), a preliminary injunction is an "extraordinary and drastic remedy." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), and "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739.

## III.    ANALYSIS

### A.    Likelihood of Success on the Merits[4]

The Ex Post Facto Clause prohibits Legislatures from "retroactively . . . increas[ing] the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 38 (1990). To succeed on an

---

[4] Because Million was charged with the relevant offense in 1993—the year before the first iteration of Tennessee's sex registry was adopted—the entirety of SORVTA applies retroactively to him. Thus, upon a finding that Million is likely to succeed on the merits, TBI will be enjoined from enforcing SORVTA against him in its entirety. *See Doe #11 v. Lee*, No. 3:22-cv-00338, 2022 WL 2181800, at *12 (M.D. Tenn. June 16, 2022) ("The first step in an ex post facto analysis is to identify precisely which provisions of the law at issue apply retroactively to the plaintiff, considering the date of his applicable offense(s).").

7

as-applied Ex-Post-Facto-clause challenge to a state's operation of a sexual offender registry, a plaintiff must show that his inclusion on the registry would amount to a retroactive punishment.[5]

The Sixth Circuit applies five factors in evaluating whether the purpose or effects of a law are punitive in nature: (1) "Does the law inflict what has been regarded in our history and traditions as punishment?"; (2) "[d]oes it impose an affirmative disability or restraint?"; (3) "[d]oes it promote the traditional aims of punishment?"; (4) "[d]oes it have a rational connection to a non-punitive purpose?"; and (5) "[i]s it excessive with respect to this purpose?" *Does #1-5 v. Snyder*, 834 F.3d 696, 701 (6th Cir. 2016) (citations omitted). These factors are meant to serve as "useful guideposts" rather than required elements; they are "neither exhaustive nor dispositive." *Smith v. Doe*, 538 U.S. 84, 97 (2003) (internal quotation marks and citations omitted).

Before addressing each factor, the Court notes that a number of other Tennessee district courts have already taken up this very issue. In *Reid v. Lee*, 476 F. Supp. 3d 684, 708 (M.D. Tenn. 2020) ("*Reid* I") and *Jordan v. William*, No. 3:19-cv-00907, 2020 WL 4676477, at *19 (M.D. Tenn. Aug. 12, 2020), for instance, the U.S. District Court for the Middle District of Tennessee found that the Act likely violated the ex post facto clause and granted preliminary injunctive relief. In *Doe v. Rausch*, 461 F. Supp. 3d 747, 769 (E.D. Tenn. 2020), another judge

---

[5] There is technically an analytic step that precedes the five-factor test—assessing whether the legislature intended the law to establish "civil proceedings". *Smith v. Doe*, 538 U.S. 84, 92 (2003) (*Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)). If a court finds this is not the case and that the legislature intended the law to impose punishment, the inquiry ends. *Id.* But because legislatures nearly always include a statement of civil intent, the answer to this question is typically no. Indeed, the Act includes provisions stating its purpose is public safety, directing that it "shall not be construed as punitive[,]" and noting that "the general assembly does not intend that the information be used to inflict retribution or additional punishment on those offenders." Tenn. Code Ann. § 40-39-201(6), (8).

in this Court granted a permanent injunction in favor of a plaintiff who brought an ex post facto challenge to the Act.

In 2007, over a decade before these cases were decided, the Sixth Circuit upheld the Act in *Doe v. Bredesen*, 507 F.3d 998, 1008 (6th Cir. 2007). However, in the period between when the Sixth Circuit decided that case and the aforementioned district-court cases, the Tennessee General Assembly made the requirements of the Act substantially more onerous, as discussed above. *Supra* I.A.

More recently, the Sixth Circuit enjoined application of Michigan's Sex Offenders-Registration Act ("SORA"), which bears significant similarity to the current regime in Tennessee, against a plaintiff bringing an as-applied ex-post-facto challenge. *Snyder*, 834 F.3d 696. Since the decision, multiple Tennessee district courts have agreed both that *Snyder* is binding Sixth Circuit precedent and that Tennessee and Michigan's registration systems are substantially similar. *See, e.g.*, *Does #1–9 v. Lee*, 574 F. Supp. 3d 558, 561 (M.D. Tenn. 2021) ("The question of whether Tennessee's *ex post facto* application of its sexual offender requirements to individuals like [Plaintiff] is illegal under *Snyder* may not be entirely beyond debate, but the issue has been addressed so clearly and so many times that the court assumes that all of the attorneys and government officials involved understand the basic jurisprudential lay of the land."); *Doe #11*, 2022 WL 2181800, at *12 ([T]he Sixth Circuit's published decision in *Snyder*, which found Michigan's similar Sex Offender[s] Registration Act to be punitive in effect for purposes of the Ex Post Facto Clause, is of central importance to the Court's analysis."). In *Reid I*, the Middle District of Tennessee observed that "[v]irtually every observation that the Sixth circuit made about the Michigan regime could be made about [Tennessee's] Act with, at most, minimal tweaking." 476 F. Supp. 3d at 706. In *Rausch*, this Court confirmed that "*Snyder*

is binding precedent upon this Court." 461 F. Supp. 3d at 759 (citations omitted). The Middle

District joined this consensus in *Reid I* when it stated it "has no difficulty joining [other

Tennessee district courts in] consider[ing] Tennessee's current law under *Snyder*."[6] 476 F. Supp.

3d at 706; *see also Reid v. Lee*, 597 F. Supp. 3d 1177, 1196 (M.D. Tenn. 2022) ("*Reid II*")

("Although the . . . Director [of TBI] maintain[s] that *Snyder* was 'wrongly decided,' it is

undisputed that *Snyder* is the law of this circuit and binding on this court.").

Despite the widespread adherence to the case within the Sixth Circuit, the TBI argues

*Snyder* was "wrongly decided" and instead places great weight in *Seling v. Young*, 531 U.S. 250

(2001)—a case in which the Supreme Court advised that a determination of whether a law is

punitive despite a legislature's statement to the contrary should be based on "reference to a

variety of factors 'considered in relation to the statute on its face'" rather than "merely on

vagaries in the implementation of the authorizing statute." (Doc. 18, at 5–6); *Seling*, 531 U.S. at

262–63 (quoting *Hudson v. United* States, 522 U.S. 93, 100 (1997). Though accounts of a

statute's effects on individual plaintiffs may be illustrative, the court advised, they are

insufficient on their own to demonstrate a law's punitive effect or purpose. *Id.* at 256–65.

TBI argues that, because Million and the cases he relies upon focus on the individualized

effects of SORVTA, his challenge to the statute cannot succeed under *Seling*.[7] (Doc. 18, at 5.)

---

[6] The court engaged in a more in-depth explanation of why it relied on *Snyder*'s analysis of the
Michigan statute, observing that, while both *Snyder* and *Bredesen* are binding precedent in this
circuit, the statute at issue in the latter case "is not the same as the statute in effect today." 476 F.
Supp. 3d at 706. The court went on to clarify that "the Sixth Circuit, in *Snyder*, did not overrule
its earlier cases, but it did make clear that *Doe v. Bredesen* should not be viewed as mandating a
rubber stamp for more restrictive registration regimes." *Id.* This Court agrees and will apply
*Snyder*'s analysis to SORVTA.

[7] It is unclear to the Court whether TBI intends to argue *Seling* foreclosed *all* as-applied ex-post-
facto challenges to SORVTA, as TBI made reference at the preliminary-injunction hearing to the
fact that the Act has not been found facially invalid. To the extent TBI is advancing this
argument, it is unavailing. Multiple Tennessee district courts have allowed plaintiffs' as-applied

Assuming TBI is correct in its interpretation of what *Seling* demands,[8] this characterization downplays the showings plaintiffs bringing ex-post-facto challenges to SORVTA—Million included—have made. Though he does detail the impact the Act's retroactive application has had on him as an individual, this is not the only evidence Million provides. *See Seling*, 531 U.S. at 256–65 (noting that accounts of a statute's effects on individual plaintiffs may be illustrative of its punitive nature). In his preliminary-injunction motion, Million analyzes *Snyder*'s five

---

ex-post-facto challenges to SORVTA proceed, and *Seling* dealt specifically with an as-applied challenge after the highest state court had already "definitively construed" the statute as civil. *See Arthur v. United States*, 253 A.3d 134, 141 (D.C. 2021) (internal quotation marks and citations omitted) ("There can be found in a number of court decisions language suggesting, incorrectly we think, that *Seling* established that ex post facto challenges cannot be brought on an as-applied basis. A more precise description of the holding of *Seling* is that the Supreme Court rejected the argument that a statute can be declared punitive 'as applied' to a particular person when the highest State court has already definitively construed the statute as civil.").

[8] Some courts have interpreted *Seling*'s directive not to rely solely on individual effects in demonstrative a statute's punitive nature to apply only to as-applied challenges to statutes that have been deemed civil by the state's highest court. *See Arthur*, 253 A. 3d at 141. Other courts, including Judge Richardson of the U.S. District Court for the Middle District of Tennessee, have disagreed, finding such a distinction to be irrelevant. *See Doe #11 v. Lee*, No. 3:22-cv-00338, 2022 WL 2181800, at *10 n.14 (cleaned up), ("*Seling* was fundamentally concerned with the 'unworkable' nature of as-applied analysis that 'would never conclusively resolve whether a particular scheme is punitive and would thereby prevent a final determination of the scheme's validity.' . . . . The Court does not see why the presence or absence of a prior definitive construction of the statute as civil by the state's highest court is relevant to this key workability concern."), at *11 (citing *Seling*, 531 U.S. at 262) ("[SORVTA] is either civil or punitive, and the Court must decide that question without reference to the effect that Act has on a single individual"). Other courts, including the U.S. District Court for the Eastern District of Tennessee and the Sixth Circuit in *Snyder*, make no explicit reference to *Seling* and its opaque standard in assessing the punitive effect of SORVTA. *See Reid II*, 597 F. Supp. 3d at 1200 (not mentioning *Seling* by name, but noting that the factors applied in *Snyder* "do not call for a fine-grained analysis of the day-to-day effects of a law on any given person in any given situation, because the factors are designed to render a verdict regarding whether a law is punitive or non-punitive with regard to *everyone*") (emphasis in original); *Snyder*, 834 F.3d. at 702–05 (lacking any citation to *Seling* and relying on plaintiff-specific details to determine whether SORA was punitive in nature). This Court need not take a firm stance in this debate at this juncture, as it finds Million is likely to succeed on his as-applied ex-post-facto challenge to the statute no matter which level of stringency is read into *Seling* and its applicability to this context.

guiding factors to elucidate SORVTA's overarching punitive effect without reference to his personal circumstances. (Doc. 9, at 13–16.)

As demonstrated in its analysis of each factor that follows, the Court finds this showing to be sufficient for purposes of determining whether SORVTA is facially punitive in nature. *See Reid II*, 597 F. Supp. 3d at 1200 (noting that a sparse evidentiary record did not block a plaintiff from relief because "[t]he [factors applied in *Snyder*] look at the broad, general features of a law on its face" rather than "a fine-grained analysis of the day-to-day effects" of the law); *see also Does #1–9*, 574 F. Supp. 3d at 562–63 (referencing *Seling* in stating that an as-applied ex-post-facto challenge "can typically be ascertained simply by identifying the law at issue, placing the law in context, and piecing together the chronology of the law's adoption and the underlying criminal offense"); *Doe #11*, 2022 WL 2181800, at *23 (citation omitted) (noting that less complete evidence may be sufficient in a preliminary injunction motion than in a trial on the merits).

### i. *Whether SORVTA Inflicts What has Been Regarded in our History and Traditions as Punishment*

The first factor, historical and traditional understandings of punishment, suggests SORVTA is punitive in nature. In *Snyder*, the Sixth Circuit held that Michigan's sex-offender-registry act, SORA, "resemble[d] . . . the ancient punishment of banishment" as well as "traditional shaming punishments." 476 F. Supp. 3d at 701–02. The Sixth Circuit reasoned that SORA prevented registrants from living or working in huge portions of the state's more populous regions, branded registrants with derogatory and overbroad classifications through its three-tiered classification system, and imposed a burdensome reporting system that "resembles the punishment of parole/probation." *Id.* at 701–03.

The Court agrees with Judge Trauger of the U.S. District Court for the Middle District of Tennessee in her conclusion that "there is no meaningful way in which [SORVTA] is less like a traditional punishment than the Michigan law was." *Reid II*, 597 F. Supp. 3d at 1196. As Million notes, SORVTA imposes burdens akin to those viewed by the Sixth Circuit as reminiscent of traditional shaming, banishment, and probation punishments. (Doc. 9, at 15.)

a.    Shaming

SORVTA's classification system and registration requirements, which function almost identically to Michigan's statute, resemble the traditional punishment of shaming. A registrant's position on SORVTA's classification hierarchy—which sorts "violent sexual offenders" and "offenders against children" from "sexual offenders"—is branded on an identification card he must carry with him and is posted online in a searchable, publicly-available database.[9] See *Rausch*, 461 F. Supp. 3d at 763–64; Tenn. Code Ann. §§ 40-39-206(d), 213(a). This classification is made without any individualized assessment as to the threat a registrant may pose to the community. *See* Tenn. Code Ann. § 40-39-202. The same could be said of these requirements as the Sixth Circuit said of SORA's when it drew the statute's comparison to traditional shaming punishments: "[SORVTA] ascribes and publishes tier classifications corresponding to the state's estimation of present dangerousness without providing for any individualized assessment." *Snyder*, 834 F.3d at 702.

TBI's assertion that Million must show SORVTA "requires registered sexual offenders in Tennessee to undergo face-to-face confrontations with the public designed to humiliate

_____

[9] As the Court has mentioned, TBI elected to reclassify Million—mid-litigation—from a "violent sexual offender" to a "sexual offender." (Doc. 18-3, at 2.) If the Court is to analyze the five factors facially under *Seling* as TBI directs, Million's rank on SORVTA's hierarchy is not determinative of the statute's resemblance to the traditional punishment of shaming.

offenders" goes beyond the Sixth Circuit's analysis in *Snyder*. (Doc. 18, at 11.) The court based its holding that SORA resembled traditional shaming punishments on the statute's ascription and publication of tier classifications "corresponding to the state's estimation of present dangerous without providing for any individualized assessment." *Snyder*, 476 F. Supp. 3d at 702. Nonetheless, TBI seeks to hold Million to a higher standard, which it has evidently done— without success—in the recent past. *See Reid II*, 597 F. Supp. 3d at 1198 (finding the Governor and TBI Director's argument that SORVTA does not resemble shaming because it "neither promoted face-to-face confrontations between the public and offenders nor seeks to humiliate the offender" to be without merit given "Michigan's registration scheme did not expressly promote face-to-face confrontations or humiliation any more than Tennessee's does").

<u>b.</u>    Parole & Probation

The Court also agrees with Million (and its previous decision in *Rausch*) that SORVTA's "reporting and travel requirements, similar to those in *Snyder*, are much like the punishment of probation or parole." (Doc. 19, at 7 (quoting *Rausch*, 461 F. Supp. 3d at 764).) Similar to SORA, which the Sixth Circuit found to meaningfully resemble probation and parole, SORVTA requires registrants to update changes to certain information within forty-eight hours, report in person at least once a year and twenty-one days minimum before leaving the country, and severely limits where registrants can live, work, and spend time. Tenn. Code. Ann. §§ 40-39-204(b)(1), (c), (h), 40-39-203(a)(7), 40-39-211(d)(1)(A)–(B); *see Snyder*, 834 F.3d at 703 (noting that "registrants are subject to numerous restrictions on where they can live and work and, much like parolees, they must report in person, rather than by phone or mail" and that "[f]ailure to comply can be punished by imprisonment, not unlike a revocation of parole"). These impositions, as other courts in this circuit have recognized, strongly resemble the "in-

Case 3:22-cv-00453-TRM-JEM    Document 22    Filed 02/10/23    Page 14 of 22    PageID #: 353

person reporting and supervision restrictions" faced by probationers and parolees.  *Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1196 (M.D. Tenn. 2021).

TBI argues SORVTA "does not impose the typical supervisory conditions that permeate every aspect of a probationer[] or parolee's life," and thus do not resemble the traditional punishment of parole or probation.  (Doc. 18, at 12.)   But the relevant "inquiry is not whether [SORVTA] is identical to probation and parole, but merely whether it resembles those traditional punishments."  *Doe #11*, No. 3:22-cv-00338, 2022 WL 2181800, at *18 (citations omitted). Therefore, the Court also finds Million has demonstrated SORVTA's resemblance to traditional punishments of parole and probation.

     c.     Banishment

Finally, the Court finds SORVTA's extensive restrictions on where registrants can live, work, and spend time—which are arguably more burdensome than SORA's—resemble the traditional punishment of banishment.  Under SORVTA, registrants cannot live or work within a thousand feet of the property line of any public school, private school, daycare center or other childcare facility, public park, playground, recreation center, or public athletic field.  Tenn. Code Ann. § 40-39-211(a)(1).  Nor can a registrant "[b]e upon or remain on the premises of any building or grounds of any public school, private or parochial school, licensed day care center, other childcare facility, public park, playground, recreation center or public athletic field available for use by the general public in this state when the offender has reason to believe children . . . are present."  *Id.* § 40-39-211(d)(1)(A).  The *Snyder* court found SORA's restrictions on movement—which applied to far fewer properties— to resemble "the ancient

punishment of banishment" because "its geographical restrictions are [] very burdensome, especially in densely populated areas." 834 F.3d at 701.

To illustrate the limits SORVTA places on his movement, Million appended to his preliminary-injunction motion a population map of "the entire geographic area of Knox County," the county in which he lives, that was prepared by the Knoxville, Knox County, Knoxville Utilities Board Geographic Information System ("KGIS"). (Doc. 9, at 18.) TBI challenges the sufficiency of this map, arguing that the Court, in applying *Seling*'s facial standard, must address whether SORVTA registrants are collectively "banished" from denser, more urban regions of Tennessee—not just the county in which Million currently resides.[10] (Doc. 18, at 8.) But even without a more comprehensive map of the Act's effect on the state, the Court can nonetheless conclude that its geographic restrictions "are sufficiently severe that inclusion on the registry is at least sufficiently comparable to banishment to weigh in favor" of finding the Act to be at least as punitive in Tennessee as the Sixth Circuit found SORA to be in Michigan. *Reid II*, 597 F. Supp. 3d at 1199; *see id. at* 1198–99 (declaring "there is simply no serious or plausible basis for denying that, in Tennessee's denser cities, schools, parks, and daycares are geographically commonplace and difficult to avoid," and taking judicial notice "of what anyone else in [Nashville] can see: that [parks, schools, child-care facilities, and recreation areas] are numerous and spread throughout at least much of the city") (citing Rule 201 of the Federal Rules of Evidence, which permits a court to "judicially notice a fact that is not subject to reasonable dispute because it" either "(1) is generally known within the trial court's territorial jurisdiction;

_____

[10] TBI also quibbles with the map's legitimacy, given it contains a disclaimer that "KGIS makes no representation or warranty as to the accuracy of this map and its information nor to its fitness for use." (Doc. 18, at 8 n.1.) The Court does not find that this disclaimer prevents it from taking judicial notice of the presence of "protected areas" from which Tennessee registrants are effective banned. *See* Fed. R. Evid. 201(b)(2).

or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Even if the Court were to assume this showing has not been sufficiently made, "it is not necessary that [SORVTA] resemble *more than one* traditional form of punishment" to find this factor favors Million. *Doe #11*, at *20 (emphasis in original).

Because the Court finds Million has shown SORVTA resembles the traditional punishments of banishment, shaming, and probation, this factor suggests Million will succeed in his as-applied ex-post-facto challenge to the statute.

### ii. Whether SORVTA Imposes an Affirmative Disability or Restraint

The second factor, affirmative disability and restraint, also suggests SORVTA is punitive in nature. In *Snyder*, the Sixth Circuit found that SORA's restrictions on a registrant's ability to live, work, and loiter amounted to "restraints . . . greater than those imposed [in *Smith*, where the Supreme Court upheld Alaska's sex-offender-registry regime,] by an order of magnitude." 834 F.3d at 703. Also relevant to this determination was SORA's requirement that certain registrants make in-person reports, both initially and for updates. *Id.* The court decisively dispensed with Michigan's argument that its statute's restraints were not physical and thus, not significant or direct, with an evocative visual: "surely something is not 'minor and indirect' just because no one is being lugged off in cold irons bound . . . . [T]hose irons are always in the background since failure to comply with [the statute's] restrictions carry with it the threat of serious punishment, including imprisonment." *Id.*

Tennessee's statute levies similar—if not more onerous—"direct restraints on personal conduct." *Id.* As Million observes, SORVTA imposes "arduous and burdensome in-person reporting obligations . . . an annual $150 registration fee, and severe penalties for violating any provision of the law." (Doc. 9, at 15 (citing See Tenn. Code Ann. §§ 40-39-204(b)(1), 208(a)–

(e)).)  If a person fails to comply with SORVTA's arduous requirements, he faces a felony conviction.  Tenn. Code Ann. § 208(b).  Other Tennessee district courts have viewed these characteristics of the statute as "impos[ing] an affirmative restraint on a [r]egistrant's personal conduct."  *Doe #11*, 2022 WL 2181800, at *20 (referencing the court's previous finding in *Doe #1*, 518 F. Supp. 3d at 1197, that SORVTA's geographical restrictions, reporting requirements, and the threat of a felony conviction for noncompliance "resemble probation, and probation is a restriction on liberty").

TBI recycles a failed argument in contending SORVTA's "in-person reporting and registration requirements, registration fee, and penalties for violations" do not constitute affirmative restraints, because "the Supreme Court has already found similar registration requirements not to be punitive" in *Smith v. Doe*.  (Doc. 18, at 14.)  Judge Richardson resolved a similar argument in *Doe #11*, noting SORVTA's residency restrictions and in-person reporting requirements "are similar to those in the Michigan statute the Sixth Circuit has already distinguished from the Alaska statute at issue in *Smith*."  2022 WL 2181800, at *21.  The Court agrees and finds this factor supports a finding that SORVTA is punitive in nature.

### iii.        *Whether SORVTA Promotes the Traditional Aims of Punishment*

The third factor, traditional aims of punishment, also militates in favor of finding SORVTA is punitive in nature, but without much sway in the analysis.  In *Snyder*, the Sixth Circuit found that the Michigan law "advances all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence."  834 F.3d at 704.  Nonetheless, the court "[ga]ve[] this factor little weight," acknowledging that "many of these goals can also rightly be described as civil and regulatory."  *Id.*

Though the *Snyder* court's conclusions about SORA's goals can be transposed onto SORVTA, so too can its observations of these aims' civil and regulatory nature. The Court accordingly also gives this factor little weight.

### iv.    Whether SORVTA Bears a Rational Connection to a Nonpunitive Purpose

The fourth factor, relationship to a non-punitive purpose, also militates in favor of finding the law is punitive. In *Snyder*, the Sixth Circuit found the link to the Michigan law's purported non-punitive purpose to be tenuous, offering "scant support for the proposition that [SORA] in fact accomplish[ed] its professed goals." 834 F.3d at 704. In arriving at this conclusion, the court cited a study "suggest[ing] that sex offenders . . . are actually *less* likely to recidivate than other sorts of criminals." *Id.* (citing Lawrence A. Greenfield, *Recidivism of Sex Offenders Released from Prison in 1994* (2003)) (emphasis in original). The court also took note of a statistical analysis that "concluded that laws such as SORA actually *increase* the risk of recidivism, probably because they exacerbate risk factors of recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* at 704–05 (emphasis in original) (citing J.J. Prescott & Jonah E. Rockoff, *Do Sex Offender Registration and Notification Laws Affect Criminal Behavior?*, 54 J. L. & Econ. 161 (2011)).

The empirical evidence discussed in *Snyder* is applicable to SORVTA, suggesting these factors also demonstrate Million's likelihood of success. Given the nature of the evidence and the similarity of Michigan and Tennessee's sex-offender-registry statutes, this Court finds no compelling reason why it "would apply differently in Tennessee than it does in Michigan." *Reid*, 476 F. Supp. 3d at 707. TBI's assertion that Million must prove "that Tennessee's interest in public safety is a sham or pretext" for the Court to construe this factor in his favor is not supported by the Sixth Circuit's analysis in *Snyder*; the Court will not hold him to this standard.

(Doc. 18, at 16.) Therefore, the Court finds Million has adequately demonstrated a likelihood of success on this factor.

> ### v.     *Whether SORVTA is Excessive with Respect to the State's Alleged Nonpunitive Purpose*

The final factor also suggests SORVTA's overarching effect is punitive. In evaluating this factor, the *Snyder* court accounted for any of SORA's "salutary effects" to measure up against its observed punitive impact. 834 F.3d at 705. In doing so, the Sixth Circuit found "no evidence in the record that the difficulties the statute imposes on registrants are counterbalanced by any positive effects," particularly in regard to SORA's requirement that registrants make "frequent, in-person appearances before law enforcement." *Id.*

Million has shown he is likely to prevail on this factor. As he points out, absent evidence that "difficulties the statute imposes on registrants are counterbalanced by any positive effects, the SORVTA's onerous requirements must be considered excessive in relation to its purpose." (Doc. 9, at 16 (internal quotation marks and citation omitted).) Multiple Tennessee district courts have agreed that SORVTA "is facially excessive with respect to its asserted non-punitive purpose of preventing recidivism because it[, like SORA,] lacks sufficient salutary effects to justify its punitive consequences." *Doe #11*, 2022 WL 2181800, at *24 (citing *Doe #1*, 518 F. Supp. 3d at 1202). Instead of providing proof of SORVTA's salutary effects, TBI cites generally to the high medical costs of sexual assaults and increased rate of sexual assault experienced by teenagers at locations falling with the statute's designated protected areas. (Doc. 18, at 17–18.) As Million notes, TBI does not, and likely cannot, connect this data to SORVTA to demonstrate its "salutary effects." (Doc. 19, at 9); *see Doe #11*, 2022 WL 2181800, at *24–25 (finding defendants' citation to medical expenses and data about common locations of sexual assaults unconvincing for failure to "point to *evidence* (as opposed to sheer intuition) that [SORVTA's]

restrictions actually prevent such offenses"). Accordingly, TBI's statistics do not serve to undermine Million's likelihood of success on this factor.

### B. Remaining Factors

Finding all five factors favor Million and thus that Million is likely to demonstrate SORVTA is facially punitive, the Court next evaluates the remaining preliminary-injunction considerations.

#### i. Irreparable Injury

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). When a plaintiff's "constitutional right is being threatened or impaired, a finding of irreparable injury is mandated," *Bonell v. Lorenzo*, 241 F. 3d 800, 809 (6th Cir. 2001), or at the very least "presumed." *Vitolo v. Guzman*, 999 F. 3d 353, 360 (6th Cir. 2021).

Because the Court has found Million is likely to succeed on the merits in his ex-post-facto claim, it also finds he would suffer irreparable harm absent an injunction.

#### ii. Harm to Others & Public Interest

The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he public interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (citations omitted).

TBI urges the Court to consider SORVTA's "protective features"—the space it places between registrants and potential victims where in the places where sexual offenses are more

likely to occur as well as the broadcasting of registrants' offense information—which it claims serve the public interest. (Doc. 18, at 23–24.) But nothing in the record suggests Million poses a particular threat or that any such threat would be mitigated by his inclusion on Tennessee's sex-offender registry. The offense that landed Million on Tennessee's registry occurred thirty years ago and did not even result in a conviction. (Doc. 19, at 10–11.) In the intervening years, Million represents he "has not been charged with any crime, much less a sex offense." (*Id.* at 11.) In fact, in an effort to ensure he did not run afoul of the law, Million even confirmed with registry's former supervisor that he did not need to register upon moving to Tennessee in 2006. (*Id.*) These factors weigh in favor of granting a preliminary injunction.[11]

## IV.    CONCLUSION

For the aforementioned reasons, Million's preliminary-injunction motion (Doc. 8) is hereby **GRANTED**. The Court **ORDERS** that, effective **February 10, 2023**, TBI is **ENJOINED** from enforcing SORVTA against Million.

SO ORDERED.

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

[11] The Court also agrees with Judge Richardson that a retroactive sex-offender registry "is not a license to heap an endless parade of new and severe punishments on individuals whose long-ago offenses carried no such consequences when committed" and finds the public would be served by defending against attacks to the constitutional provision designed to protect against this kind of behavior. *Does #1-9 v. Lee*, 574 F. Supp. 3d 558, 563–64 (M.D. Tenn. 2021).